# United States District Court
## STATE AND DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT**<br>Case Number: |
| V. | 08-MJ-361 AJB |
| (01) DAVID GUY MCKAY<br>(02) BRADLEY NEIL CROWDER | |

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about at least August 31, 2008, through September 3, 2008, in Ramsey County, in the State and District of Minnesota, the defendant(s), David Guy McKay and Bradley Neil Crowder,

each aiding and abetting the other, knowingly and intentionally possessed firearms, namely Molotov cocktails, that were not registered to them, in the national Firearms Registration and Transfer Record

in violation of Title 26 United States Code, Section(s) 5861(d), and Title 18, United States Code, Section 2,

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes   ☐ No

Signature of Complainant
Christopher V. Langert
FBI

Sworn to before me, and subscribed in my presence,

Date: September 5, 2008

at Minneapolis, MN
City and State

The Honorable Arthur J. Boylan
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer

Signature of Judicial Officer

SCANNED
SEP 0 5 2008
U.S. DISTRICT COURT MPLS

STATE OF MINNESOTA   )                    **AFFIDAVIT OF SPECIAL AGENT**
                     ) ss.                **CHRISTOPHER LANGERT**
COUNTY OF HENNEPIN   )

1.  I am a special agent with the Federal Bureau of Investigation. I have been so employed for 10 years. This affidavit is based on personal knowledge as well as information related to me by other investigating officers.

2.  In February 2007, a confidential human source ("CHS 1") who has been working with the FBI since November 2007, and who has a proven track record of reliability, began providing the FBI in San Antonio, Texas, with information regarding the activities of a group of individuals involved in planning to disrupt the Republican National Convention ("RNC").

3.  The group of Texas individuals on whom the source was reporting has been named by law enforcement officials as the Austin Area Affinity Group ("the Affinity Group"). Bradley Neal Crowder has been identified through CHS reporting as a leader of the Austin Affinity Group. David McKay has been identified as a member of the Austin Affinity Group.

4.  In May 2008, CHS 1 reported that Crowder attended a meeting in Minneapolis where numerous individuals from across the United States met to discuss preparations for protesting and disrupting the RNC.

5.  CHS 1 reported that, on August 28, 2008, eight members of the Affinity Group left Austin, Texas in a rented white passenger

1

van. The group had a trailer attached to the van. The FBI learned through investigation of the rental company that the van was rented by a known member of the Affinity Group and that the reservation to rent the van was made by Crowder. CHS 1 reported that the trailer was rented by group members David McKay and Bradley Crowder. CHS 1 also reported that the group was holding 35 shields inside the trailer.

6.  CHS 1 reported that these shields were assembled by taking stolen traffic barrels, cutting them in half, painting them black, cutting out a rectangular area that was fitted with plexiglass to allow the user of the shield to see through the shield, and then securing the plexiglass to the shield with four screws. The screws were placed in the shield so that the screw tips protruded from the shield to allow the shield to be used as a weapon. CHS 1 reported that the group discussed using these shields to attack police officers. The FBI has observed one of these shields, which matches CHS 1's description of the devices. St. Paul Police seized 34 shields that fit CHS 1's description from the group's trailer on August 31, 2008.

7.  CHS 1 reported that, following the seizure of these shields by police, Crowder, McKay and others went to Walmart to purchase "gear" and bolt cutters. CHS 1 learned from another member of the Austin Affinity Group that McKay and others went to purchase a gas container and tampons. Law enforcement officers

have learned by reviewing surveillance video tapes at Walmart that on August 31, 2008, Crowder, McKay and other members of the Austin Affinity Group went to Walmart, located at 1450 University Avenue, St. Paul, and purchased, among other things, the following items: a two-gallon gas can, tampons, motor-oil, a package of rubber bands, ear plugs, a pair of bolt cutters, a bike helmet and elbow pads. The group entered the store at approximately 8:50 p.m. and members of the group exited between 9:01 p.m. and 9:16 p.m.

8. Your affiant knows that tampons, oil, rubber bands and gas containers are commonly used in the construction of Molotov cocktails. Specifically, your affiant is aware that tampons are commonly used as wicks for Molotov cocktails, that gas containers are used to store fuel for use in Molotov cocktails, that rubber bands are one method used to affix a wick (such as a tampon) to the side of a Molotov cocktail and that oil is commonly mixed with gas in the construction of Molotov cocktails to increase the flammability of the fuel and to allow the fuel to stick to whatever it hits.

9. On the morning of September 1, 2008, CHS 1 reported to law enforcement that another member of the Affinity Group told CHS 1 that items purchased from Walmart were being stored at an apartment in St. Paul. Law enforcement officers learned that the lessee of the apartment is affiliated with the Affinity Group and that the apartment is located on Dayton Street in St. Paul.

10.  Later on September 1, 2008, an FBI surveillance operations group member who was familiar with McKay's and Crowder's physical appearances, observed both Crowder and McKay entering and exiting the St. Paul residence described previously.

11.  Late on September 1, 2008, CHS 1 reported to law enforcement that McKay informed CHS 1 that there were eight assembled Molotov cocktails in the basement of the residence where McKay was staying. Law enforcement knew that this was the Dayton street apartment.

12.  On September 1, 2008, a second Confidential Human Source ("CHS 2") who has been working with your affiant for the past five months, and has been found to be extremely reliable, met with McKay at a Dayton Street apartment in St. Paul, Minnesota. The apartment at which CHS 2 met McKay is rented by a woman affiliated with the Affinity Group. Officers have learned of the link between the lessee and the Affinity group through human source reporting and a statement made by the woman to members of St. Paul Police on September 3, 2008.

13.  This meeting between CHS 2 and McKay was captured by consensual audio and video surveillance. During their meeting, McKay told CHS 2 that his name was "David," that he had a falling out with other members of his group, and that he and a couple other individuals were going to conduct "Red Actions" on September 2, 2008. McKay also told CHS 2 that McKay had been arrested and

4

released on September 1 and that his friend had been arrested and was scheduled to be released at 8:00 a.m. on September 2, 2008. McKay also invited CHS 2 to accompany him to conduct "Red Actions."

14. The FBI has learned through independent investigation that McKay was arrested and cited for disorderly conduct then released by St. Paul Police on September 1, 2008. The FBI has also learned through independent investigation that Crowder was arrested for disorderly conduct on September 1, 2008, and remains in custody.

15. On September 2, 2008, CHS 1 and McKay met. During the course of their conversation, McKay used coded language to disguise the nature of the subjects of their conversation. During their conversation, which was transmitted to law enforcement officers via electronic surveillance equipment, McKay told CHS 1 that he [McKay] and Crowder manufactured several Molotov cocktails together. McKay said that the Molotov cocktails consisted of half gasoline and half motor oil, with tampons as wicks. McKay told CHS 1 that the wicks were soaked in lighter fluid. McKay told CHS 1 that the Molotov cocktails would be lit and thrown at vehicles parked in a parking lot, the location of which McKay then described. Law enforcement officers have confirmed the existence of this parking lot, which is located close to the Dayton Street apartment where the Molotov cocktails were found. Law enforcement officers have observed that the parking lot is used by marked and unmarked law enforcement vehicles and is visibly patrolled by individuals wearing U.S. Secret Service vests, as well as uniformed members of the military.

When describing the Molotov cocktails, McKay told CHS 1 that using tampons as wicks is "the safe way to do it."

16. During their conversation, CHS 1 asked McKay, "what if there's a cop sleeping in the car?" McKay responded, "he'll wake up." CHS 1 then asked McKay, "what if he doesn't?," to which McKay did not respond. CHS 1 also asked McKay if McKay could leave the scene with a cop burning or dying, to which McKay answered "yes." McKay also told CHS 1 that "it's worth it if an officer gets burned or maimed."

17. On September 3, 2008, St. Paul Police executed a search warrant for the "third floor living space and common areas" at a residence on Dayton Street, in St. Paul, Minnesota. The address searched pursuant to the warrant was the same location where CHS 1 and CHS 2 met with McKay. The warrant was based on the observations of St. Paul Police Officer Dave Langfellow. The search warrant specifically requested permission to search for "[w]eapons or devices that may be used as weapons." During the execution of the search warrant, officers found McKay and 2 other individuals, gas masks with filters, a bolt cutter, black ski mask, a slingshot, knee pads, and helmets, in the third floor living space of the address. Additionally, officers found a black backpack containing a bottle which contained a mixture of gasoline and oil. Next to the bottle in the backpack was a lighter stick. Prior to being removed from the residence, McKay informed officers that the backpack belonged to him.

18. Under the kitchen sink of the residence, officers found

6

a two-gallon gas container that appears to be identical to the one purchased by McKay and other members of the Affinity Group at Walmart on August 31, 2008. See Par. 7 supra.

19. In the basement area of the residence, which is a common area of the residence available to members living in any of the three apartment units in the building, officers located eight fully assembled Molotov cocktails.

20. The Molotov cocktails were found wrapped in a towel, a knit hat, and a washcloth. Six of the eight Molotov cocktails were found in a black Nike duffel bag. Each device consisted of a glass wine or liquor bottle filled with a mixture of gas and oil. The bottles were each capped. Each bottle also had a tampon wick secured to its neck with rubber bands. Your affiant knows that this is a frequently used method of constructing Molotov cocktails that lessens the chance that the person throwing the Molotov cocktail will be inadvertently burned by the fuel inside the bottle.

21. On September 4, 2008, your affiant conducted a Mirandized interview of McKay at the Ramsey County Jail. After acknowledging his rights and waiving them, McKay told your affiant that he [McKay] and Crowder assembled the Molotov cocktails together at the St. Paul residence referenced in paragraphs 17-20 supra. McKay told your affiant words to the effect that their intent was to use the devices to offensively get back at someone or something.

22. Federal law makes it a felony for a person to "receive or possess a firearm which is not registered to him in the National

7

Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The term "firearm" includes a destructive device. 26 U.S.C. § 5845(a). The term "destructive device" in turn means any explosive, incendiary, or poison gas . . . bomb . . . ." 26 U.S.C. § 5845(f). The term "destructive device" also includes "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled." Id. I am aware that assembled Molotov cocktails qualify as destructive devices under this statute. I am also aware that unassembled Molotov cocktails have been held to constitute destructive devices under the latter definition relating to any combination of parts from which a destructive device may be readily assembled.

23. The United States Attorney's Office for the District of Minnesota caused a check to be made of the National Firearms Registration and Transfer Record, which is maintained by the Bureau of Alcohol, Tobacco and Firearms. As of September 4, 2008, that check revealed that during the relevant time period there have not been any firearms as defined above registered to Bradley Crowder or David McKay.

Further your affiant sayeth not.

Christopher V. Langert
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 5 day of September, 2008.

Arthur J. Boylan
U.S. Magistrate Judge.

8